*In re* ROWLING'S ESTATE.

1. WILLS—UNDUE INFLUENCE—OPPORTUNITY.

Under record showing, at most, only an opportunity to exercise undue influence in the execution of a will, it was error to leave the matter of undue influence to the jury.

2. SAME—PRESUMPTIONS—FAILURE TO LEAVE ESTATE TO UNFRIENDLY NEAR RELATIVES.

A testator's failure to leave his estate to near relatives with whom he is not on good terms does not create a presumption of undue influence on the part of those who are beneficiaries under the will.

3. SAME—TEST OF MENTAL CAPACITY.

The test of mental capacity to make a will is that testator must have sufficient mental capacity to enable him to know what property he possesses and of which he is making a testamentary disposition, to know who are the natural objects of his bounty, and understand what disposition he is making of his property.

4. SAME — MENTAL COMPETENCY — INSANE DELUSIONS — BURDEN OF PROOF.

> In contest of will on the ground that testatrix was mentally incompetent to make a will because she suffered from insane delusions, contestants have burden of proof she was mentally incompetent and that the insane delusions influenced her in the making of the will.

5. SAME—FAILURE TO RECOGNIZE OLD FRIENDS.

> Failure to recognize old friends does not denote mental incapacity to make a will.

6. SAME—WEAKNESS OF MIND—FORGETFULNESS.

> Weakness of mind and forgetfulness are not sufficient to invalidate a will if it appears that the testator's mind was capable of attention and exertion when aroused and was not imposed upon, and, so long as testamentary capacity exists, courts will not undertake to measure the degree of that capacity and will protect those deficient in strong natural ability in the exercise of the powers they do possess.

7. SAME—CONNECTED CONVERSATION—FORGETFULNESS.

> Inability of testator to carry on a connected conversation and forgetfulness are not sufficient to invalidate a will on the ground of mental incompetency.

8. SAME—INCOMPETENCY AS OF TIME OF EXECUTION.

> Mental incompetency must be established as of the time the will is made in order to invalidate it.

9. SAME—QUESTION FOR JURY—EVIDENCE—INSANE DELUSIONS.

> In will contest wherein it was sought to invalidate will of 86-year old testatrix on ground of mental incapacity, evidence that she was unable to operate a radio some 7 years prior and that she had an alleged delusion 3 or 4 months after will was executed, which was not shown to have had any connection with will executed, when taken in connection with testimony that she maintained and managed her home until after will was executed, *held,* insufficient to take question of mental incompetency to jury.

Appeal from Wayne; Chenot (James E.), J. Submitted October 18, 1939. (Docket No. 76, Calendar No. 40,754.) Decided December 19, 1939.

In the matter of the estate of Margaret J. Rowling, deceased. The last will and testament of Mar-

garet J. Rowling was presented for probate. Paul J. Rowling and Thomas Rowling objected thereto. Case certified to circuit court. Verdict and judgment for contestants. Proponents appeal. Reversed.

*James J. Shea* and *Wm. Henry Gallagher,* for proponents.

*Sempliner, Dewey, Stanton & Honigman* (*Fred G. Dewey* and *Thomas L. Poindexter,* of counsel), for contestants.

POTTER, J. This is a will contest in which the contestants prevailed. Proponents appeal.

The deceased, Margaret J. Rowling, and husband in about the year 1875 began living in the upper peninsula of Michigan. They lived there until 1903 when they moved to Detroit. Mr. Rowling died in 1916 and at the time of his death, six children survived, namely, William, born in 1876; Henry, born in 1878; Annie J. Elliot, born in 1880; Lillian Joyce, born in 1884, deceased 1930; Thomas F., born in 1886; and Paul J., born in 1889.

William Rowling started work at 13 years of age and gave his earnings to his parents until he was 21 years of age. He was married and lives in Washtenaw county. Henry Rowling married in 1900 and since 1922 has lived next door to his mother. Annie J. Rowling married in 1907 and since that time has lived in her own home. Thomas F. Rowling never married and made his home with his mother until March, 1936, when he left at his mother's request. Paul J. Rowling has lived away from home since his marriage in 1913. Lillian Rowling Joyce married in 1913; and from 1917 to 1929, she, her husband and

children occupied the mother's home with her. Lillian died in 1930 and her husband and sons resumed living with Mrs. Rowling until 1933, when she felt she could no longer have the responsibility of Lillian's two sons. Mrs. Rowling occupied the home for a period of about 33 years with the exception of a period of time spent with her sister in California.

Mrs. Rowling first discussed the making of a will in 1934; and again on or about June 5, 1936, she brought up the subject of a will. She requested her son William to bring a lawyer to the house and suggested that he go to her bank which would probably recommend a lawyer. The bank recommended A. F. Holihan, a lawyer who lived in the neighborhood. Mr. Holihan called upon her the next morning and she told him her desires with respect to the disposition of her property. When this discussion took place, William remained in the room with his mother's permission. Mr. Holihan returned in two or three days with a rough draft of the proposed will and went over the same with her. The original instructions given by Mrs. Rowling directed that her sons Paul and Thomas receive nothing, but the revised draft of the will directed that one dollar be bequeathed to Thomas "to take him to where he threatened to send me." On June 10, 1936, Mr. Holihan returned to Mrs. Rowling's residence with the final draft, accompanied by attorney C. G. Webb, who was his office associate. The will was signed on June 10, 1936.

From 1934 until September 8, 1936, Mrs. Rowling had had no medical attention, but on the latter date a doctor was called to her home to treat an ulcer on her leg which had broken. Upon the advice of her physician, she went to live with her daughter Annie. Until September 23, 1936, she was up and about her

room daily. On October 23, 1936, she had a heart attack. On October 30, 1936, she had a recurrence of a gall bladder attack that she had suffered from years before. On November 23d she had another heart attack, and on December 25, 1936, passed away at the age of 86 years.

Shortly after the death of Mrs. Rowling, an instrument was filed purporting to be her last will and testament. The purported will failed to make any bequests to the sons Paul or Thomas. Notice of contest was filed on the grounds of lack of testamentary capacity and undue influence; the case was certified to the circuit court and a trial had before a jury. After the contestants had rested their case, the proponents moved for a directed verdict sustaining the will. The trial court denied the motion and submitted the cause to the jury. The jury returned a verdict for contestants.

It is the claim of contestants that William and Henry influenced their mother against Thomas and Paul; that Harry and Billie Joyce, grandchildren of deceased, were driven from their grandmother's home in 1933 by the constant criticism of William; and that from the time of the execution of the will until the death of Mrs. Rowling, William and Henry attempted to prevent Thomas from seeing his mother.

In our opinion, it was error to submit the question of undue influence to the jury. An examination of the testimony contained in the record satisfies us that at most there was only an opportunity to exercise undue influence. *In re Lacroix's Estate,* 265 Mich. 59, we said, "proof of opportunity to exercise undue influence is not sufficient."

See, also, *In re Murray's Estate,* 219 Mich. 70; *In re Estate of Burwitz,* 272 Mich. 16; *In re La Liberte's Estate,* 272 Mich. 424.

Nor does a testator's failure to leave his estate to near relatives with whom he is not on good terms create a presumption of undue influence on the part of those who are beneficiaries under the will. *Pritchard* v. *Hutton,* 187 Mich. 346.

Counsel for contestants also contend that Mrs. Rowling lacked the mental capacity to execute a will. They produced testimony tending to show her inability in 1929 to operate a radio; that she directed Thomas' agent, engaged in moving his things from her home, to take them to the basement; that in September or October, 1936, she had a delusion of having seen her deceased daughter; that in January, 1929, she wrote a letter addressed to her son Paul in which she accuses him of having sent her strychnine, although the letter was never mailed and was found after her death; that she failed to provide in her will for Harry and Billie Joyce, the sons of her deceased daughter Lillian; that her memory was failing; and that she was frugal and refused to spend a few cents for a bandage for her leg.

The general rule as to the competency of a person to make a will is well stated in *Re Walker's Estate,* 270 Mich. 33, where we said:

"In general the requisite is that the testator must at the time of making his will have sufficient mentality to enable him to know what property he possesses and of which he is making a testamentary disposition, to consider and know who are the natural objects of his bounty, and to understand what the disposition is that he is making of his property by his will."

We have in mind the rules that the burden of proof is upon contestants to prove that testatrix was mentally incompetent to make a will; that if testatrix suffered from insane delusions, the insane delusions influenced testatrix in the making of her will,

*Jackson City Bank & Trust Co.* v. *Townley,* 268 Mich. 340; *In re Rosa's Estate,* 210 Mich. 628; and that failure to recognize old friends does not denote mental incapacity, *In re Fox's Estate,* 240 Mich. 465.

In *Schneider* v. *Vosburgh,* 143 Mich. 476, we said:

"Weakness of mind and forgetfulness, therefore, are not sufficient to invalidate a will or deed, if it appears that the testator's or the grantor's mind was capable of attention and exertion when aroused and was not imposed upon. It has been truly said that the weak have the same right with the prudent and strong minded to dispose of their property. In general, so that capacity exists, courts will not undertake to measure the degree of that capacity, and they will protect those deficient in strong natural ability in the exercise of the powers they possess."

Inability to carry on a connected conversation and forgetfulness are not sufficient to invalidate a will. *In re Briner's Estate,* 275 Mich. 396. See, also, *In re Littlejohn's Estate,* 239 Mich. 630; *Soules* v. *Soules,* 202 Mich. 561.

The rule is clear that mental incompetency must be established as of the time the will is made in order to invalidate it. *Pierce* v. *Pierce,* 38 Mich. 412; *In re Weber's Estate,* 201 Mich. 477; *In re Cochrane's Estate,* 211 Mich. 370; *In re Cottrell's Estate,* 235 Mich. 627.

In our determination of the issue involved in this cause, we have in mind that the will was executed June 10, 1936, and the inability of testator in 1929 to operate a radio can have no bearing upon her mental capacity, especially in view of the fact that she maintained and managed her home until a date after the execution of the will, nor do we think the alleged delusion in September or October, 1936, sufficient to invalidate the will. It must be remembered

that this claimed delusion occurred three or four months after the execution of the will; and we do not find any evidence that such mental aberration had any bearing upon the framing of the will.

We have examined into the other claims of mental incapacity, but do not find, in any of them or all of them taken together, sufficient evidence of mental incompetency to submit to a jury. It follows that the trial court was in error in submitting this question to the jury.

Judgment is reversed, with directions to certify the will to the probate court for further proceedings. Proponents may recover costs.

BUTZEL, C. J., and WIEST, CHANDLER, NORTH, and MCALLISTER, JJ., concurred. BUSHNELL and SHARPE, JJ., did not sit.